[No. B007907. Second Dist., Div. Five. Dec. 27, 1984.]

WILLIAM FRANCIS BARTLING et al., Plaintiffs and Appellants, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Defendant and Respondent;
GLENDALE ADVENTIST MEDICAL CENTER et al.,
Real Parties in Interest and Respondents.

188

COUNSEL

Malley, Yelsky, Rosenfeld & Scott, Richard Stanley Scott, Stephen A. Malley, George J. Annas and Leonard H. Glantz for Plaintiffs and Appellants.

Fenella Rouse, Hufstedler, Miller, Carlson & Beardsley, Leonard L. Gumport and Michael Feuer as Amici Curiae on behalf of Plaintiffs and Appellants.

No appearance for Defendant and Respondent.

Wood, Lucksinger & Epstein, William H. Ginsberg, Gerald W. Connor and George James Stephan for Real Parties in Interest and Respondents.

Griffith David Thomas, Brad D. Selgestad, Fred Okrand and Paul Hoffman as Amici Curiae on behalf of Real Parties in Interest and Respondents.

## OPINION

**HASTINGS, J.**—In this case we are called upon to decide whether a competent adult patient, with serious illnesses which are probably incurable but have not been diagnosed as terminal, has the right, over the objection of his physicians and the hospital, to have life-support equipment disconnected despite the fact that withdrawal of such devices will surely hasten his death.

Petitioners are William Bartling and his wife, Ruth Bartling. Real parties in interest are the Glendale Adventist Medical Center (Glendale Adventist) and Mr. Bartling's treating physicians.

The ruling challenged in this petition is the denial of petitioners' request for an injunction ordering real parties to disconnect Mr. Bartling's ventilator (commonly called a "respirator"), a machine which sustains the patient's breathing. Although petitioners filed an appeal from the superior court's order, they also filed the within petition, claiming that the situation was too urgent to await the appeal. Petitioners were unfortunately correct, for Mr. Bartling passed away the afternoon before the hearing on this petition.

Both sides in this case have urged us to address the merits of the petition and formulate guidelines which might prevent a reoccurrence of the tragedy which befell Mr. Bartling. We agree that in light of the important questions raised, this court should exercise its discretion to render an opinion in this case despite its mootness. (*Daly* v. *Superior Court* (1977) 19 Cal.3d 132, 141 [137 Cal.Rptr. 14, 560 P.2d 1193].) "The novel medical, legal and ethical issues presented in this case are no doubt capable of repetition and therefore should not be ignored by relying on the mootness doctrine. This requires us to set forth a framework in which both the medical and legal professions can deal with similar situations." (*Dority* v. *Superior Court* (1983) 145 Cal.App.3d 273, 276 [193 Cal.Rptr. 288].)

At the time of his death, Mr. Bartling was 70 years old and suffered from emphysema, chronic respiratory failure, arteriosclerosis, an abdominal aneurysm (abnormal ballooning of the main artery passing through the abdomen to the legs), and a malignant tumor of the lung. Mr. Bartling also

had a history of what real parties term "chronic acute anxiety/depression" and alcoholism.

Mr. Bartling entered Glendale Adventist on April 8, 1984, for treatment of his depression. A routine physical examination, including a chest X-ray, was performed, and a tumor was discovered on Mr. Bartling's lung. A biopsy of the tumor was performed by inserting a needle in the lung, which caused the lung to collapse. Tubes were inserted in Mr. Bartling's chest and through his nasal passage and throat in order to reinflate his lung. Because of his emphysema, the hole made by the biopsy needle did not heal properly and the lung did not reinflate. While Mr. Bartling was being treated with antibiotics to promote healing of the lung, a tracheotomy was performed and he was placed on a ventilator. Mr. Bartling remained on the ventilator until the time of his death, and efforts to "wean" him from the machine were unsuccessful.

On several occasions in April, Mr. Bartling tried to remove the ventilator tubes. To prevent accidental or deliberate disconnection of the ventilator tubes (or any of the other tubes to which he was attached), Mr. Bartling's wrists were placed in "soft restraints." Despite requests from both Mr. and Mrs. Bartling, Glendale Adventist and Mr. Bartling's treating physicians refused to remove the ventilator or the restraints.

In June of this year, petitioners filed a complaint (subsequently amended) in the superior court seeking damages for battery (unconsented medical treatment), violation of state and federal constitutional rights, breach of fiduciary duty on the part of Glendale Adventist and Mr. Bartling's treating physicians, intentional infliction of emotional distress, and conspiracy. Petitioners sought an injunction restraining real parties from administering any unconsented medical care to Mr. Bartling. This included "forcing Plaintiff to undergo mechanical breathing through the ventilator" and other medical procedures.[1] Attached to the complaint were:

(1) A "living will," signed by Mr. Bartling with an " ✕ " and properly witnessed, which stated in part: "If at such time the situation should arise in which there is no reasonable expectation of my recovery from extreme physical or mental disability, I direct that I be allowed to die and not be kept alive by medications, artificial means or heroic measures."

---

[1]Petitioners in their petition for writ of mandate before us describe the relief sought in the superior court as follows: "Petitioners sought to restore the *proper* status quo—a competent person being in control of his or her own medical care and body . . . either consenting to medical care or competently requesting that such care be terminated, and having his wishes control."

(2) A declaration from Mr. Bartling in which he stated in part: "While I have no wish to die, I find intolerable the living conditions forced upon me by my deteriorating lungs, heart and blood vessel systems, and find intolerable my being continuously connected to this ventilator, which sustains my every breath and my life for the past six and one-half (6½) weeks. Therefore, I wish this Court to order that the sustaining of my respiration by this mechanical device violates my constitutional right, is contrary to my every wish, and constitutes a battery upon my person. I fully understand that my request to have the ventilator removed and discontinued, which I have frequently made to my wife and to my doctors, will very likely cause respiratory failure and ultimately lead to my death. I am willing to accept that risk rather than to continue the burden of this artificial existence which I find unbearable, degrading and dehumanizing. I also suffer a great deal of pain and discomfort because of being confined to bed, being on this ventilator, and from the other problems which are occurring."

(3) A "Durable Power of Attorney for Health Care,"[2] executed by Mr. Bartling, appointing Mrs. Bartling as his attorney-in-fact. In this document, Mr. Bartling stated in part: "My desires concerning future medical and supportive care, which I direct my attorney-in-fact to follow, are as follows: . . . I am totally unable to care for myself, and believe that I am dependent on a mechanical ventilator to support and sustain my respiration and life. I continuously suffer agonizing discomfort, pain and the humiliating indignity of having to have my every bodily need and function tended to by others. I do not wish to continue to live under these conditions. It is therefore my intent to refuse to continue on ventilator support and thereby to permit the natural process of dying to occur—peacefully, privately and with dignity. I direct my attorney-in-fact to honor my desires in this regard, and to refuse ventilator support, at such time as I am unable to do so for myself. I am aware that impairment, incapacity and unconsciousness may occur as a result of my refusal of ventilation, but I desire that none of these be deemed to be a medical emergency."

Mr. and Mrs. Bartling and Mr. Bartling's daughter Heather all executed documents in which they released Glendale Adventist and its doctors from any claim of civil liability should the hospital and doctors agree to honor Mr. Bartling's wishes.

Despite these strong and unequivocal statements from Mr. Bartling and his family, his treating physicians refused to remove the ventilator and refused to remove the restraints which would allow Mr. Bartling to disconnect the ventilator himself should he choose to do so.

[2]The Durable Power of Attorney for Health Care Act (Civ. Code, §§ 2430-2443) enables a designated proxy to terminate health care if the principal is incompetent.

In support of their application for injunction and this petition, petitioners supplied declarations to support their contentions that (1) Mr. Bartling had a relatively short time to live, even with the ventilator; (2) he was competent to direct what medical treatment he would or would not receive; and (3) it would not be unethical for Mr. Bartling's treating physicians to honor his wishes, even if it meant disconnection of a life-sustaining machine.

Mr. Bartling's videotape deposition was taken on the day before the superior court hearing, June 21. Mr. Bartling could not speak but could nod or shake his head to indicate yes or no answers. Mr. Bartling said that he wanted to live, but did not want to live on the ventilator. He did understand that if the ventilator were removed he might die.

It was the opinion of Mr. Bartling's treating physicians, presented to the trial court by way of declarations, that Mr. Bartling's illness was not terminal and that he could live for at least a year if he was "weaned" from the ventilator. However, the doctors opined in their declarations that "weaning was unlikely because of his medical and psychological problems that were not under control."

Although they did not challenge his legal competency, the doctors and Glendale Adventist questioned Mr. Bartling's ability to make a meaningful decision because of his vacillation. This opinion was based on the declarations of several nurses who related instances in which the ventilator tube accidentally detached and Mr. Bartling signalled frantically for them to reconnect it. Mr. Bartling also made several statements to his doctors and nurses to the effect that he wanted to live and did not want the ventilator disconnected.[3]

From an ethical standpoint, declarations were submitted to the effect that Glendale Adventist is a Christian hospital devoted to the preservation of life, and it would be unethical for Glendale Adventist's physicians to disconnect life-support systems from patients whom they viewed as having the potential for cognitive, sapient life.

The hospital and doctors also expressed concern about their potential civil and criminal liability should they accede to Mr. Bartling's wishes and disconnect the ventilator.

---

[3]This same problem was addressed in *Lane v. Candura* (1978) 6 Mass.App. 377 [376 N.E.2d 1232, 93 A.L.R.3d 59], where Mrs. Candura kept changing her mind regarding amputation of a gangrenous foot. As in our present case, she testified she did not want to die but she was resigned to death and was adamantly against the operation. The court, in agreeing that the final decision was hers, stated: ". . . the fact that she has vacillated in her resolve not to submit to the operation does not justify a conclusion that her capacity to make a decision is impaired to the point of legal incompetence." (376 N.E.2d at p. 1236.)

Before making its ruling on petitioners' request for an injunction, the trial court made several factual findings, including: (1) Mr. Bartling's illnesses were serious but not terminal and had not been diagnosed as such; (2) although Mr. Bartling was attached to a respirator to facilitate breathing, he was not in a vegetative state and was not comatose; and (3) Mr. Bartling was competent in the legal sense.

The court relied substantially on *Matter of Quinlan* (1976) 70 N.J. 10 [355 A.2d 647, 79 A.L.R.3d 205], which held that life-support systems could be withdrawn from a patient in a comatose, vegetative state should his or her attending physicians conclude that there was no reasonable possibility of the patient ever emerging from that state. The court below concluded that as long as there was some potential for restoring Mr. Bartling to a "cognitive, sapient life," it would not be appropriate to issue an injunction in this case.

■ We conclude that the trial court was incorrect when it held that the right to have life-support equipment disconnected was limited to comatose, terminally ill patients, or representatives acting on their behalf.

There is no question in our minds that Mr. Bartling was, as the trial court determined, competent in the legal sense to decide whether he wanted to have the ventilator disconnected. The statements made by Mr. Bartling in his declarations and in the other documents executed by him which were submitted to the trial court reflect the fact that Mr. Bartling knew he would die if the ventilator were disconnected but nevertheless preferred death to life sustained by mechanical means. He wanted to live but preferred death to his intolerable life on the ventilator. The fact that Mr. Bartling periodically wavered from this posture because of severe depression or for any other reason does not justify the conclusion of Glendale Adventist and his treating physicians that his capacity to make such a decision was impaired to the point of legal incompetency. (See *Lane* v. *Candura, supra,* 376 N.E.2d 1232, 1234, fn. 3.)

Having resolved the threshold issue of whether or not Mr. Bartling was legally competent, we turn to the major issue in this case: whether the right of Mr. Bartling, as a competent adult, to refuse unwanted medical treatment, is outweighed by the various state and personal interests urged by real parties: the preservation of life, the need to protect innocent third parties, the prevention of suicide, and maintaining of the ethics of the medical profession. (*Superintendent of Belchertown* v. *Saikewicz* (1977) 373 Mass. 728 [370 N.E.2d 417].)

Real parties argue that the interests of the state should prevail. We disagree. In California, "a person of adult years and in sound mind has the

right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment." (*Cobbs* v. *Grant* (1972) 8 Cal.3d 229, 242 [104 Cal.Rptr. 505, 502 P.2d 1].) This principle was recently reaffirmed in *Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006 [195 Cal.Rptr. 484], in which Division Two of this court held that two physicians who were prosecuted for the alleged murder of an incurably ill patient under their care could not be held criminally liable for the patient's death: "In this state a clearly recognized legal right to control one's own medical treatment *predated* the Natural Death Act. A long line of cases, approved by the Supreme Court in *Cobbs* v. *Grant,* . . . have held that where a doctor performs treatment in the absence of an informed consent, there is an actionable battery. The obvious corollary to this principle is that a competent adult patient has the legal right to refuse medical treatment." (147 Cal.App.3d at p. 1015.) (Italics added.)[4]

California has also enacted the Natural Death Act (Health & Saf. Code, § 7185 et seq.) which provides in part: "The Legislature finds that adult persons have the fundamental right to control the decisions relating to the rendering of their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances of a terminal condition." (Health & Saf. Code, § 7186.) The *Barber* court noted that while the Act was specifically addressed to only a limited number of persons, "It is clear from the legislative findings and declaration provided in Health and Safety Code section 7186, that the Legislature recognized such a right to control one's medical treatment, especially in circumstances such as presented here." ▮ ▮▮▮ (147 Cal.App.3d at p. 1015.)[5]

---

[4]See also *Satz* v. *Perlmutter* (Fla.App. 1978) 362 So.2d 160, aff'd. (Fla. 1980) 379 So.2d 359, approving the patient's right to have an artificial life sustaining device removed. The court concluded: "[W]e find, and agree with, several cases upholding the right of a competent adult patient to refuse treatment for himself. From this agreement, we reach our conclusion that, because Abe Perlmutter has a right to refuse treatment in the first instance, he has a concomitant right to discontinue it." (362 So.2d at p. 163.)

In the same vein are cases respecting the religious right of patients to prevent or discontinue treatment as they choose. (See *In re Osborne* (D.C.App. 1972) 294 A.2d 372.)

[5]We agree with the *Barber* court's statement that the Act applies only to a "limited number of persons" (i.e., terminally ill patients). For instance, the Act permits an adult to execute, in advance, a directive for the withholding or withdrawing of life-sustaining procedures in the event he or she later suffers a terminal illness. (Health & Saf. Code, § 7188.) The Act provides a form for such a directive, one provision of which says that the patient's physicians, within the preceding 14 days, have diagnosed the patient as being terminally ill. In *Barber,* the court noted that the procedural requirements of the Act were "so cumbersome that it is unlikely that any but a small number of highly educated and motivated patients will be able to effectuate their desires." (147 Cal.App.3d at p. 1015.) In his Declaration attached to the first amended complaint, Mr. Bartling stated: "My attorney has explained the provisions of the 'California Natural Death Act'; I understand that I am not a 'qualified patient' under those provisions in that I have not had a written diagnosis of 'terminal illness' submitted to me two weeks ago, or at any time. I do not wish to wait two weeks to become a 'qualified patient' before proceeding with my earnest desire to have the ventilator disconnected."

■ This policy is also reflected in Title 22 of the California Administrative Code, section 70707, dealing with patient's rights. One of those rights is to "[p]articipate actively in decisions regarding medical care. To the extent permitted by law, this includes the right to refuse treatment." (Cal. Admin. Code, tit. 22, § 70707, subd. (6).)

The right of a competent adult patient to refuse medical treatment has its origins in the constitutional right of privacy. This right is specifically guaranteed by the California Constitution (art. I, § 1) and has been found to exist in the "penumbra" of rights guaranteed by the Fifth and Ninth Amendments to the United States Constitution. (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 484 [14 L.Ed.2d 510, 514, 85 S.Ct. 1678].) "In short, the law recognizes the individual interest in preserving 'the inviolability of the person.'" (*Superintendent of Belchertown* v. *Saikewicz, supra,* 370 N.E.2d 417, 424.) ■ The constitutional right of privacy guarantees to the individual the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity. (*Id.,* at p. 427.)

■ Balanced against these rights are the interests of the state in the preservation of life, the prevention of suicide, and maintaining the ethical integrity of the medical profession.[6] The most significant of these interests is the preservation of life. This is of prime concern to Glendale Adventist, which submitted a declaration to the effect that it is a Christian, prolife oriented hospital, the majority of whose doctors would view disconnecting a life-support system in a case such as this one as inconsistent with the healing orientation of physicians. We do not doubt the sincerity of real parties' moral and ethical beliefs, or their sincere belief in the position they have taken in this case.[7] However, if the right of the patient to self-determination as to his own medical treatment is to have any meaning at all, it must be paramount to the interests of the patient's hospital and doctors. ■ The right of a competent adult patient to refuse medical treatment is a constitutionally guaranteed right which must not be abridged. As the court stated in *Satz* v. *Perlmutter, supra,* 362 So.2d 160: "It is all very convenient to insist on continuing Mr. Perlmutter's life so that there can be no question

---

[6]A fourth state interest—the protection of innocent third parties—is not implicated in this case. This interest has been invoked, for example, where the patient attempting to refuse treatment has minor children who would be left without a parent should the treatment not proceed. The leading case in this area is *Application of President & Directors of Georgetown Col.* (D.C.Cir. 1964) 118 U.S.App.D.C. 80, 331 F.2d 1000 [9 A.L.R.3d 1367], certiorari denied, (1964) 377 U.S. 978 [12 L.Ed.2d 746, 84 S.Ct. 1884].

[7]The record in fact shows that real parties attempted to strike a compromise between their position and the wishes of Mr. and Mrs. Bartling by trying to locate another hospital which would accept Mr. Bartling as a patient. This effort was unsuccessful. As real parties point out, none of the medical ethics "experts" who submitted declarations in petitioners' behalf were willing to undertake the care of Mr. Bartling.

of foul play, no resulting civil liability and no possible trespass on medical ethics. However, it is quite another matter to do so at the patient's sole expense and against his competent will, thus inflicting never ending physical torture on his body until the inevitable, but artificially suspended, moment of death. Such a course of conduct invades the patient's constitutional right of privacy, removes his freedom of choice and invades his right to self-determination." (362 So.2d at p. 164.)

Several doctors also expressed the view that disconnecting Mr. Bartling's ventilator would have been tantamount to aiding a suicide. This is not a case, however, where real parties would have brought about Mr. Bartling's death by unnatural means by disconnecting the ventilator. Rather, they would merely have hastened his inevitable death by natural causes. (*Satz* v. *Perlmutter, supra,* 362 So.2d 160, 162-163.) Several cases have, to our satisfaction, placed this issue to rest. In *Matter of Quinlan, supra,* 70 N.J. 10, 355 A.2d 647, the court stated: "We would see, however, a real distinction between the self-infliction of deadly harm and a self-determination against artificial life-support or radical surgery, for instance, in the face of irreversible, painful and certain imminent death." (355 A.2d at p. 665.) And in *Superintendent of Belchertown* v. *Saikewicz, supra,* 370 N.E.2d 417, the court succinctly answers this argument as follows: "The interest in protecting against suicide seems to require little if any discussion. In the case of the competent adult's refusing medical treatment such an act does not necessarily constitute suicide since (1) in refusing treatment the patient may not have the specific intent to die, and (2) even if he did, to the extent that the cause of death was from natural causes the patient did not set the death producing agent in motion with the intent of causing his own death. . . . Furthermore, the underlying State interest in this area lies in the prevention of irrational self-destruction. What we consider here is a competent, rational decision to refuse treatment when death is inevitable and the treatment offers no hope of cure or preservation of life. There is no connection between the conduct here in issue and any State concern to prevent suicide." (At p. 426, fn. 11.)

Aside from their moral and ethical objections, real parties have expressed the fear that had they complied with petitioners' wishes they might face criminal and civil liability. As to criminal liability, this was substantially answered in *Barber* v. *Superior Court, supra,* 147 Cal.App.3d 1006. In *Barber* the hospital patient, Clarence Herbert, was in a comatose condition and not likely to recover. He was kept alive by a respirator and intravenous tubes which provided hydration and nourishment. His family drafted a written request to the hospital personnel stating that they wanted "all machines taken off that are sustaining life" (*sic*). The defendant physicians respected these wishes and caused the respirator and other life sustaining equipment

to be removed. Prior to the incapacities that led to his comatose condition, Mr. Herbert had expressed to his wife his feeling that he did not want to be kept alive by machines. The defendant doctors were charged with murder and conspiracy to commit murder. Although the appellate court found the actions of the physicians to be intentional and with knowledge the patient would die, based on the same law and reasons we have utilized in this opinion, the court found no criminal liability. Although our present case involves a civil action and factually is distinguishable from *Barber* in that Mr. Bartling was not comatose, we are now satisfied the law as outlined is clear and if Mr. Bartling had lived, real parties could not have been criminally or civilly liable for carrying out his instructions.[8] ■ Furthermore in future similar situations, parties facing the problems confronting real parties here should be free to act according to the patient's instruction without fear of liability and without advance court approval. In accord with our conclusion is the *Barber* court's statement that ". . . in the absence of legislative guidance, we find no legal requirement that prior judicial approval is necessary before any decision to withdraw treatment can be made.

"Although there is not complete agreement among the courts that have addressed the issue in the civil context, we agree with those which have held that requiring judicial intervention in all cases is unnecessary and may be unwise. [Citations.]" (147 Cal.App.3d at pp. 1021-1022.)

The words of the *Quinlan* court are appropriate here: "[T]here must be a way to free physicians, in the pursuit of their healing vocation, from possible contamination by self-interest or self-protection concerns which would inhibit their independent medical judgments for the well-being of their dying patients. We would hope that this opinion might be serviceable to some degree in ameliorating the professional problems under discussion." (*Matter of Quinlan, supra,* 355 A.2d at p. 668.)

Our holding that the court below erred in this case is of little consolation to Mr. Bartling. His death renders moot that portion of the petition which seeks an order compelling the superior court to grant the injunction sought. However, petitioners have also requested an award of costs and attorneys' fees under the "private attorney general" theory (Code Civ. Proc., § 1021.5). The case is remanded to the superior court for a determination as to whether attorneys' fees pursuant to section 1021.5 are appropriate. Petitioners' request for costs is also to be considered by the superior court.

---

[8]Had Mr. Bartling survived our mandatory injunction would have read "ORDERED AND ADJUDGED that William Frances Bartling, in the exercise of his right of privacy, may remain in defendant hospital or leave said hospital free of the mechanical respirator now attached to his body and all defendants and their staffs are restrained from interfering with Mr. Bartling's decision." (See *Satz* v. *Perlmutter,* 362 So.2d 160, at pp. 161-162.)

The order to show cause heretofore issued is discharged, and the petition is dismissed.

Feinerman, P. J., and Ashby, J., concurred.

A petition for a rehearing was denied January 24, 1985.