[No. B015766. Second Dist., Div. Five. Aug. 25, 1986.]

WILLIAM FRANCIS BARTLING et al., Plaintiffs and Appellants, v.
GLENDALE ADVENTIST MEDICAL CENTER et al.,
Defendants and Respondents.

**COUNSEL**

Malley, Rosenfeld & Scott and Richard Stanley Scott for Plaintiffs and Appellants.

Wood, Lucksinger & Epstein, William H. Ginsburg, George James Stephan, Gerald W. Connor and H. Scott Roman for Defendants and Respondents.

**OPINION**

**FEINERMAN, P. J.**—In *Bartling* v. *Superior Court* (1984) 163 Cal.App.3d 186 [209 Cal.Rptr. 220] *(Bartling I)*, we held that a competent nonterminally ill adult patient has a constitutionally based right to reject and/or terminate medical treatment. This appeal follows from a judgment of dismissal after the sustaining of a demurrer without leave to amend to appellants' third

amended complaint for battery, violation of constitutional and federal civil rights, breach of fiduciary duty, and intentional infliction of emotional distress and conspiracy. The sustaining of the demurrer was preceded by an order striking several allegations from the complaint. Appellants contend that the trial court erred in striking the allegations, absent which the demurrer assertedly would not have been sustained.[1]

## FACTUAL BACKGROUND

On April 8, 1984, William Bartling entered Glendale Adventist Medical Center (Glendale Adventist) for treatment of severe chronic depression. At the time of his admission, Bartling was suffering from pulmonary emphysema, atherosclerotic cardiovascular disease, coronary arteriosclerosis, an abdominal aneurysm and lung cancer.

On April 14, 1984, a needle biopsy of Mr. Bartling's left lung caused it to collapse. Attempts to reinflate his lung failed and a mechanical ventilator was soon attached by way of a tracheostomy. Mr. Bartling remained on the ventilator until the time of his death on November 6, 1984.

While hospitalized, Mr. Bartling often tried to remove the ventilator tubes from his body. To prevent accidental or deliberate disconnection of the tubing, Mr. Bartling was restrained by cloth cuffs around his wrists.

On May 30, 1984, Mr. Bartling executed a living will, asking that he not be kept alive by artificial means or heroic measures. He also signed a declaration which in part stated that, "While I have no wish to die, I find intolerable the living conditions forced upon me by my deteriorating lungs, heart and blood vessel systems and find intolerable my being continuously being connected to this ventilator, which sustains my every breath and my life for the past six and one-half (6½) weeks. Therefore, I wish this Court to recognize, honor and protect my constitutional right to liberty, privacy, self-dignity and the control of my own body. I wish this Court to order that the sustaining of my respiration by this mechanical device violates my constitutional right, is contrary to my every wish, and constitutes a battery upon my person."

His declaration continued by stating, "I fully understand that [this] request . . . which I have frequently made to my wife and to my doctors, will very likely cause respiratory failure and ultimately lead to my death. I am willing

---

[1]The orders granting the motions to strike and sustaining the demurrer to the third amended complaint were made on May 29, 1985. The judgment of dismissal is also dated May 29, 1985.

to accept that risk rather than to continue the burden of this artificial existence which I find unbearable, degrading and dehumanizing. I also suffer a great deal of pain and discomfort because of being confined to bed, being on this ventilator, and from the other problems which are occurring."

Mr. Bartling further executed a "Durable Power of Attorney for Health Care," which appointed Mrs. Bartling as his attorney-in-fact.[2] He, his wife and daughter also executed documents which released Glendale Adventist and its physicians from any claim of civil liability, should the hospital and doctors honor Mr. Bartling's wishes.

In June, July and August of 1984, doctors did try to "wean" Mr. Bartling from his ventilator. They resuscitated him, however, when Mr. Bartling's breathing and/or heart action failed during the weaning process. Given Mr. Bartling's desire not to be resuscitated, Glendale Adventist tried to transfer him to another hospital. No other facility was willing to take him. (*Bartling I, supra,* 163 Cal.App.3d at p. 195, fn. 4.) Mr. Bartling was a patient at Glendale Adventist until his death on November 6, 1984.

### PROCEDURAL BACKGROUND

On May 29, 1985, the trial court granted respondents' motion to strike the following allegations from each cause of action in appellants' third amended complaint: (a) respondents acted in deliberate, knowing and conscious disregard for the rights of the Bartlings in a manner that shocked the community; (b) respondents caused Mr. Bartling actual damages of humiliation, anguish and grave discomfort; (c) respondents' conduct was extreme, malicious, and outrageous. Additionally, the Bartlings' prayer for general and punitive damages was stricken. A demurrer was sustained without leave to amend and a judgment of dismissal entered.

### DISCUSSION

Appellants contend that the trial court erroneously struck portions of their complaint, absent which the demurrer assertedly would not have been sustained. As discussed below, we find no abuse of discretion in the trial court's actions and affirm the judgment.

To frame our analysis of appellants' contentions, we look first to our reasoning in *Bartling I.* There, we concluded that the State's interests in preserving life, preventing suicide and maintaining the ethical integrity of

---

[2]The durable power of attorney for health care (Civ. Code, §§ 2430-2443) allows a designated proxy to terminate health care if the principal is incompetent.

the medical profession did not prevail over the right of a competent adult to discontinue his life support systems. While we vindicated Mr. Bartling's right to die, we also stressed the sincerity of Glendale Adventist's position. As a pro-life oriented hospital, a majority of Glendale Adventist's doctors viewed disconnection of life supports in a case like this as incongruous with the healing obligations of physicians. (*Bartling I, supra,* 163 Cal.App.3d at p. 195.) We further noted that Glendale Adventist tried to effect a compromise between their own position and the desires of the Bartlings by seeking to find another hospital which would admit Mr. Bartling. Unfortunately, this effort failed. Indeed, "none of the medical ethics 'experts' who submitted declarations in support of the [Bartlings] were willing to undertake [Mr. Bartling's care]." (*Bartling I, supra,* 163 Cal.App.3d at p. 195, fn. 7.) Thus, a declaration of Bartling's own attorney indicates that many institutions refused Mr. Bartling as a patient due to potential medical costs they might have to absorb or for fear of criminal and civil liability.[3]

The reluctance of other hospitals to take Mr. Bartling, despite the execution of civil liability release forms by Mr. Bartling, his wife and daughter, underscores the fact that courts have been developing new guidelines for the medical profession with respect to competent adult patients' rights to die. The case law in this area is evolving towards a greater recognition of patients' rights. Nevertheless, it cannot be said that a common or comprehensive legal standard was in place to guide the medical community at the time of Bartling's hospitalization—one which clearly should have compelled Glendale Adventist to "pull the plug" on Mr. Bartling's ventilator. What the Bartlings insist was a reckless disregard of Mr. Bartling's rights, Glendale Adventist saw as a responsible regard for the preservation of life. The determination of the patient's right to die under extant law was a judgment call. (Comment, *Balancing the Right to Die With Competing Interests: A Socio-Legal Enigma* (1985) 13 Pepperdine L.Rev. 109, 119.)[4] It was only

---

[3]In the Bartlings' July 17, 1984, application for a temporary restraining order and preliminary and permanent injunction on the basis of new facts (Code Civ. Proc., § 527, subd. (a) and § 1008, subd. (b)), Bartling's attorney claimed the following: "A frequent reason given for declining this transfer has been the near-expiration of the patient's 'lifetime Medicare benefits'. Further, many institutions cite the recent (but ultimately unsuccessful) prosecutions of Drs. Nejdl and Barber for murder [(*Barber* v. *Superior Court* (1983) 147 Cal.App.3d 1006 [195 Cal.Rptr. 484, 47 A.L.R.4th 1])] as reasons for avoiding this situation. On this basis, these institutions are unwilling to accept or believe the offer of civil liability release offered by Plaintiffs and their counsel."

[4]At the time of *Bartling I,* the issue of criminal culpability had been largely resolved in *Barber* v. *Superior Court, supra,* 147 Cal.App.3d 1006. In *Barber,* a deeply comatose patient was removed from life-sustaining machines and intravenous tubes for hydration and nourishment at the request of his family. Two of the doctors were subsequently charged with murder and conspiracy to commit murder. Although the appellate court found the doctors' actions to be intentional and with knowledge that the patient would die, the defendants' actions were held to be lawful. The court recognized a patient's statutory right to refuse

after *Bartling I* that California's physicians had legal precedent for freely acting according to a competent adult patient's instructions to terminate life support systems without fear of civil liability and without advance court approval. (*Bartling I, supra,* 163 Cal.App.3d at p. 197.)

■ This leads us to the allegations stricken by the trial court in the third amended complaint. First, appellants alleged that respondents acted in conscious disregard of their rights in a manner that would shock the conscience of the community. While we found in *Bartling I* that respondent's refusal to withdraw treatment intruded upon Mr. Bartling's right to privacy, we cannot agree that the Bartlings' rights were so well-defined at the time of Mr. Bartling's hospitalization that Glendale Adventist deliberately acted with "conscious disregard" of their patient's constitutional rights.

Respondents' commitment to the preservation of life was sincere and rooted in what they believed were prevailing medical and legal standards. That commitment was not untoward in the uncertain medical and legal climate which Glendale Adventist confronted before the issuance of *Bartling I.* The crosscurrents of change had not yet subsided. Glendale Adventist tried unsuccessfully to honor Mr. Bartling's wishes by transferring him to another medical facility. Left to follow their own ethically-informed, albeit legally self-protective, course, the hospital's use of soft restraints and close supervision was not so extreme as to shock the community. In evaluating the sufficiency of appellants' first allegation, we find it to be conclusionary in nature and improper. We find no error in the trial court's action in striking this allegation. (Code Civ. Proc., § 436, subd. (a).)[5]

■ Appellants next alleged that respondents' activities caused Mr. Bartling actual damages of humiliation, anguish and grave discomfort. Mr. Bartling died on November 6, 1984. We need only note that a decedent's cause of action for pain and suffering dies with him. (Prob. Code, § 573.)[6]

---

treatment and determined that the physicians did not have a duty to provide continuous, but futile, life-sustaining treatment. Unlike *Barber, Bartling* involves a civil action, and a patient who was not comatose. The court in *Barber* recognized that there was not uniform agreement among the courts which had addressed the right-to-terminate treatment issue in a civil context. The *Barber* court stated that it agreed with those courts which had held that requiring judicial intervention in all cases is unnecessary and perhaps unwise. (*Barber* v. *Superior Court, supra,* 147 Cal.App.3d 1006, 1022.)

[5]Code of Civil Procedure section 436, subdivision (a) provides in part as follows: "The court may, upon a motion made pursuant to section 435, or at any time in its discretion, and upon terms it deems proper: [¶] (a) strike out any irrelevant, false, or improper matter inserted in any pleading."

[6]Probate Code section 573 reads in pertinent part as follows: "When a person having a cause of action dies before judgment, the damages recoverable . . . shall not include damages for pain, suffering or disfigurement."

■    Appellants further alleged that respondents' actions were extreme, malicious and outrageous. Appellants use the term malice, as defined in Civil Code section 3294, subdivision (c)(1), to mean conduct which is intended to cause injury or which is carried on by the defendant with a "conscious disregard" of the rights or safety of others.

As we have previously indicated, appellants' rights were not legally established or clearly developed in California before *Bartling I*. We believe that respondents could not reasonably have foreseen that their effort to preserve life was legally tantamount to a "conscious disregard" of appellants' rights. (See *Peterson* v. *Superior Court* (1982) 31 Cal.3d 147, 158-159 [181 Cal.Rptr. 784, 642 P.2d 1305].) Obviously, such foreseeability is a condition precedent to any "conscious disregard" of individual rights. Additionally, we find no factual basis upon which appellants may argue that Glendale Adventist intended to cause Mr. Bartling injury. Accordingly, this allegation was also properly stricken.

■    As we stated in *Bartling I*, respondents were acting in conformance with what they believed to be their professional and religious obligations. We find no factual support for appellants' claim that respondents' actions were extreme and outrageous or that they warranted an assessment of general or punitive damages. Moreover, as noted above, Mr. Bartling has no claim for pain and suffering as a matter of law. Thus, the court properly dismissed appellants' alleged causes of action for battery, violation of Mr. Bartling's constitutional right to privacy and breach of fiduciary duty.

In completing our analysis, we briefly review appellants' remaining causes of action for intentional infliction of emotional distress, conspiracy, and violation of appellants' state and federal civil rights. (42 U.S.C., § 1985(3).)

■    The elements of a prima facie case of intentional infliction of emotional distress are (1) outrageous conduct by the defendant, (2) intent to cause or reckless disregard of the probability of causing emotional distress, (3) severe emotional suffering and (4) actual and proximate causation of emotional distress. (*Bogard* v. *Employers Casualty Co.* (1985) 164 Cal.App.3d 602, 616 [210 Cal.Rptr. 578].)

■    "Outrageous conduct" denotes conduct which is so extreme as to exceed all bounds of decency and which is to be regarded as "atrocious, and utterly intolerable in a civilized community." (*Bogard* v. *Employers*

*Casualty Co., supra,* 164 Cal.App.3d at p. 616; *Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 499, fn. 5 [86 Cal.Rptr. 88, 468 P.2d 216].) ■ While Mr. Bartling's suffering was obviously acute, the facts before us do not rise to the level of such atrocious and indecent behavior on the part of respondents, nor do they show a malevolent or reckless disregard for Mr. Bartling's painful struggle for medical self-determination.

Nevertheless, appellants urge that because respondents were in a position of superior power to the Bartlings, we should adopt the test for outrageous conduct enunciated in the Restatement Second of Torts section 46, comments e and f. The Restatement declares that behavior may be considered outrageous if the defendant (1) abuses a relation or position which gives him power to damage the plaintiff's interest, (2) knows the plaintiff is susceptible to injury through mental distress, or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress.

Appellants cite two cases to support their claim that respondents' conduct was outrageous according to this standard. In *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288 [131 Cal.Rptr. 547], a landlord threatened retaliatory eviction of a tenant who had organized a tenants' meeting to discuss rent increases. The court found that the respondent's continuous harassment and intimidation of appellant was outrageous and intended to cause fear and worry. Appellants also cite *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376 [89 Cal.Rptr. 78, 47 A.L.R.3d 286], in which an insurance company threatened in bad faith not to make payments under the plaintiff's disability policy.

These two cases are readily distinguishable. Here, respondents acted in reliance on what they believed to be prevailing community medical and legal standards and did not use their superior position to intentionally harass or intimidate the Bartlings.

■ Alternatively, appellants now urge that the facts support a cause of action for negligent infliction of emotional distress for Mrs. Bartling, even though this cause of action was *not* pled in their complaint. Appellants never alleged facts which show that the quality of medical attention provided Mr. Bartling fell below the medical community standard of care. Indeed, the gravamen of appellants' complaint is that respondents refused to discontinue the very quality medical care which was prolonging appellant's life. Since Mrs. Bartling's cause of action for negligent infliction of emotional distress can only be derived from negligent treatment of her husband, appellants fail to state a legally cognizable cause of action in Mrs. Bartling's

behalf. (*Dillon* v. *Legg* (1968) 68 Cal.2d 728, 733 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].).)[7]

■ ■■■ Appellants attempted to plead a cause of action for conspiracy to deprive Mr. Bartling of his constitutional rights to privacy, liberty and self-determination, in violation of federal Civil Rights Act, 42 U.S.C. section 1985(3).[8] ■ To state a cause of action under section 1985(3), "a complaint must allege (1) a conspiracy, (2) to deprive any person or a class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, property damage or a deprivation of any right or privilege of a citizen of the United States." (*Gillespie* v. *Civeletti* (1980) 629 F.2d 637, 641.) A party must allege "'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" (*Griffin* v. *Breckenridge* (1971) 403 U.S. 88, 102 [29 L.Ed.2d 338, 348, 91 S.Ct. 1790], quoted in *Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 320 [216 Cal.Rptr. 718, 703 P.2d 58].) ■ Here, appellants' cause of action must fail for want of an invidiously discriminatory animus behind the good faith efforts of Glendale Adventist to preserve Mr. Bartling's life.

■ Appellants also set forth a cause of action for conspiracy to commit the other allegedly wrongful acts enumerated in their complaint. Since we do not find that appellants established a factual basis for its other allegations, there can be no conspiracy.

■ In reviewing the sufficiency of a complaint against a general demurrer, the Supreme Court has summarized the rules by which we are guided: "'We treat the demurrer as admitting all material facts properly

---

[7]Further, appellants' reliance on the Supreme Court's holding in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159 [216 Cal.Rptr. 661, 703 P.2d 1] is misplaced. There, the parents of a minor in juvenile hall suffered emotional distress stemming from the failure or refusal of authorities to provide their son with appropriate medical attention. The boy's mother was aware of and observed conduct by the defendants which produced injury to her child. She knew he needed immediate medical attention and that defendants had failed to exercise their duty of care. Such is not the case at bench.

[8]Appellants' complaint pleads a cause of action for violation of 42 U.S.C. section 1985(3). Yet, appellants' opening brief argues about the trial court's failure to apply federal notice pleading standards to the Federal Civil Rights Act, 42 U.S.C. section 1983. A claim under section 1983 requires conduct under color of state law which deprives an individual of rights, privileges, or immunities secured by the constitution or laws of the United States. (*Parratt* v. *Taylor* (1981) 451 U.S. 527, 535-537 [68 L.Ed.2d 420, 428-430, 101 S.Ct. 1908].) In appellants' opposition to defendants' motion to strike certain portions of plaintiffs' first amended complaint and memorandum of points and authorities, dated August 3, 1984, appellants concede that they have no cause of action under section 1983, intending instead to cite to 42 U.S.C. section 1985(3). Consequently, we make no further comment on appellants' section 1983 argument.

pleaded, *but not contentions, deductions or conclusions of fact or law.* [Citation.] *We also consider matters which may be judicially noticed.'* [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.] When a demurrer is sustained, we determine whether the complaint states facts sufficient to constitute a cause of action. [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment; if it can, the trial court has abused its discretion and we reverse; if not, there has been no abuse of discretion and we affirm. [Citations.] The burden of proving such reasonable possibility is squarely on the plaintiff. [Citation.]" (*Blank* v. *Kirwan, supra,* 39 Cal.3d at pp. 311, 318.) (Italics added.)

Here, appellants have failed to carry their burden of proof. They were given several opportunities to amend their complaint and we find no reasonable possibility that the defects discussed above can be cured by further amendment.

The judgment is affirmed.

Ashby, J., and Eagleson, J., concurred.