ORDER
The opinion in the above-entitled case, No. 90-55981, slip op. 9429 (9th Cir. Aug. 5, 1992), is amended by deleting footnote 4 on page 9449, and substituting in its place the following:
[Editor’s Note: This change has been incorporated into the published opinion.]
With this amendment the panel has voted to deny the petition for rehearing. Judges Browning and Reinhardt reject the suggestion for rehearing en banc and Judge Booc-hever recommends rejection of the suggestion for rehearing en banc.
The full court has been advised of the suggestion for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. (Fed.R.App.P. 35.)
The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.
OPINION
BOOCHEVER, Circuit Judge:
Defendants Frito-Lay, Inc., and Tracy-Locke, Inc., appeal a jury verdict and award of $2.6 million in compensatory damages, punitive damages, and attorney’s fees, in favor of singer Tom Waits. Waits sued the snack food manufacturer and its advertising agency for voice misappropriation and false endorsement following the broadcast of a radio commercial for SalsaR-io Doritos which featured a vocal performance imitating Waits’ raspy singing voice. On appeal, the defendants mount attacks on nearly all aspects of the judgment.
In challenging the judgment on Waits’ voice misappropriation claim, the defendants first contend that our decision in Midler v. Ford Motor Co., 849 F.2d 460 (9th Cir.1988), cert. denied, — U.S. —, 112 S.Ct. 1513, 1514, 117 L.Ed.2d 650 (1992), recognizing voice misappropriation as a California tort, is no longer good law. Next, they contend that the district court erred in instructing the jury on the elements of voice misappropriation. Finally, the defendants urge us to vacate portions of the jury’s damage award, arguing that several types of compensatory damages as well as punitive damages are unavailable as a matter of law, and in any event lack evidentiary support.
In challenging the judgment on Waits’ false endorsement claim under section 43(a) of the Lanham Act, the defendants contend that Waits lacks standing to sue because he is not in competition with the defendants. They also argue that Waits did not establish his claim at trial, and that damages and attorney’s fees were improperly awarded.
Because it is duplicative, we vacate the award of damages under the Lanham Act. We affirm in all other respects.
*1097 BACKGROUND
Tom Waits is a professional singer, songwriter, and actor of some renown. Waits has a raspy, gravelly singing voice, described by one fan as “like how you’d sound if you drank a quart of bourbon, smoked a pack of cigarettes and swallowed a pack of razor blades____ Late at night. After not sleeping for three days.” Since the early 1970s, when his professional singing career began, Waits has recorded more than seventeen albums and has toured extensively, playing to sold-out audiences throughout the United States, Canada, Europe, Japan, and Australia. Regarded as a “prestige artist” rather than a musical superstar, Waits has achieved both commercial and critical success in his musical career. In 1987, Waits received Rolling Stone magazine’s Critic’s Award for Best Live Performance, chosen over other noted performers such as Bruce Springsteen, U2, David Bowie, and Madonna. SPIN magazine listed him in its March 1990 issue as one of the ten most interesting recording artists of the last five years. Waits has appeared and performed on such television programs as “Saturday Night Live” and “Late Night with David Letterman,” and has been the subject of numerous magazine and newspaper articles appearing in such publications as Time, Newsweek, and the Wall Street Journal. Tom Waits does not, however, do commercials. He has maintained this policy consistently during the past ten years, rejecting numerous lucrative offers to endorse major products. Moreover, Waits’ policy is a public one: in magazine, radio, and newspaper interviews he has expressed his philosophy that musical artists should not do commercials because it detracts from their artistic integrity-
Frito-Lay, Inc. is in the business of manufacturing, distributing, and selling prepared and packaged food products, including Doritos brand corn chips. Tracy-Locke, Inc. is an advertising agency which counts Frito-Lay among its clients. In developing an advertising campaign to introduce a new Frito-Lay product, SalsaRio Doritos, Tracy-Locke found inspiration in a 1976 Waits song, “Step Right Up.” Ironically, this song is a jazzy parody of commercial hucksterism, and consists of a succession of humorous advertising pitches.[1] The commercial the ad agency wrote echoed the rhyming word play of the Waits song. In its presentation of the script to Frito-Lay, Tracy-Locke had the copywriter sing a preliminary rendition of the commercial and then played Waits’ recorded rendition of “Step Right Up” to demonstrate the feeling the commercial would capture. Frito-Lay approved the overall concept and the script.
The story of Tracy-Locke’s search for a lead singer for the commercial suggests that no one would do but a singer who could not only capture the feeling of “Step Right Up” but also imitate Tom Waits’ voice. The initial efforts of the ad agency’s creative team, using a respected professional singer with a deep bluesy voice, met with disapproval from executives at both Tracy-Locke and Frito-Lay. Tracy-Locke then auditioned a number of other singers who could sing in a gravelly style.
Stephen Carter was among those who auditioned. A recording engineer who was acquainted with Carter’s work had recommended him to Tracy-Locke as someone who did a good Tom Waits imitation. Carter was a professional musician from Dallas and a Tom Waits fan. Over ten years of performing Waits songs as part of his band’s repertoire, he had consciously perfected an imitation of Waits’ voice. When Carter auditioned, members of the Tracy-Locke creative team “did a double take” over Carter’s near-perfect imitation of Waits, and remarked to him how much he sounded like Waits. In fact, the commercial’s musical director warned Carter that he probably wouldn’t get the job because he sounded too much like Waits, which *1098 could pose legal problems. Carter, however, did get the job.
At the recording session for the commercial David Brenner, Tracy-Locke’s executive producer, became concerned about the legal implications of Carter’s skill in imitating Waits, and attempted to get Carter to “back off” his Waits imitation. Neither the client nor the members of the creative team, however, liked the result. After the session, Carter remarked to Brenner that Waits would be unhappy with the commercial because of his publicly avowed policy against doing commercial endorsements and his disapproval of artists who did. Brenner acknowledged he was aware of this, telling Carter that he had previously approached Waits to do a Diet Coke commercial and “you never heard anybody say no so fast in your life.” Brenner conveyed to Robert Grossman, Tracy-Loeke’s managing vice president and the executive on the Frito-Lay account, his concerns that the commercial was too close to Waits’ voice. As a precaution, Brenner made an alternate version of the commercial with another singer.
On the day the commercial was due for release to radio stations across the country, Grossman had a ten-minute long-distance telephone consultation with Tracy-Locke’s attorney, asking him whether there would be legal problems with a commercial that sought to capture the same feeling as Waits' music. The attorney noted that there was a “high profile” risk of a lawsuit in view of recent case law recognizing the protectability of a distinctive voice. Based on what Grossman had told him, however, the attorney did not think such a suit would have merit, because a singer’s style of music is not protected. Grossman then presented both the Carter tape and the alternate version to Frito-Lay, noting the legal risks involved in the Carter version. He recommended the Carter version, however, and noted that Tracy-Locke would indemnify Frito-Lay in the event of a lawsuit. Frito-Lay chose the Carter version.
The commercial was broadcast in September and October 1988 on over 250 radio stations located in 61 markets nationwide, including Los Angeles, San Francisco, and Chicago. Waits heard it during his appearance on a Los Angeles radio program, and was shocked. He realized “immediately that whoever was going to hear this and obviously identify the voice would also identify that [Tom Waits] in fact had agreed to do a commercial for Doritos.”
In November 1988, Waits sued Tracy-Locke and Frito-Lay, alleging claims of misappropriation under California law and false endorsement under the Lanham Act. The case was tried before a jury in April and May 1990. The jury found in Waits’ favor, awarding him $375,000 compensatory damages and $2 million punitive damages for voice misappropriation, and $100,-000 damages for violation of the Lanham Act. The court awarded Waits attorneys’ fees under the Lanham Act. This timely appeal followed.
DISCUSSION
I. Voice Misappropriation
In Midler v. Ford Motor Co., 849 F.2d 460, 463 (9th Cir.1988), cert. denied, — U.S. —, 112 S.Ct. 1513, 1514, 117 L.Ed.2d 650 (1992), we held that “when a distinctive voice of a professional singer is widely known and is deliberately imitated in order to sell a product, the sellers have appropriated what is not theirs and have committed a tort in California.” The Midler tort is a species of violation of the “right of publicity,” the right of a person whose identity has commercial value — most often a celebrity — to control the commercial use of that identity. See Motschenbacher v. R.J. Reynolds Tobacco Co., 498 F.2d 821, 824-25 (9th Cir.1974). See generally J.T. McCarthy, The Rights of Publicity and Privacy (1987) (hereafter Publicity and Privacy). We recognized in Midler that when voice is a sufficient indicia of a celebrity’s identity, the right of publicity protects against its imitation for commercial purposes without the celebrity’s consent. See Midler, 849 F.2d at 463.
The jury found that the defendants had violated Waits’ right of publicity by broadcasting a commercial which featured a deliberate imitation of Waits’ voice. In doing *1099 so, the jury determined that Waits has a distinctive voice which is widely known. On appeal, the defendants attack the legal underpinnings of voice misappropriation, arguing that Midler is no longer an accurate statement of California law. They also find fault with the court’s formulation of the elements of voice misappropriation in its instructions to the jury. Finally, they attack both the compensatory and punitive damages awarded by the jury as legally inappropriate and unsupported by the evidence. We address each contention in turn.
A. Continuing Viability of Midler
As a threshold matter, the defendants ask us to rethink Midler, and to reject it as an inaccurate statement of California law. Midler, according to the defendants, has been “impliedly overruled” by the Supreme Court’s decision in Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 109 S.Ct. 971,103 L.Ed.2d 118 (1989). Additionally, they argue that the Midler tort is preempted by the federal Copyright Act. We review these questions of law de novo. See Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).
Bonito Boats involved a Florida statute giving perpetual patent-like protection to boat hull designs already on the market, a class of manufactured articles expressly excluded from federal patent protection. The Court ruled that the Florida statute was preempted by federal patent law because it directly conflicted with the comprehensive federal patent scheme. In reaching this conclusion, the Court cited its earlier decisions in Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Comyco Corp. v. Day-Brite Lighting, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), for the proposition that “publicly known design and utilitarian ideas which were unprotected by patent occupied much the same position as the subject matter of an expired patent,” i.e., they are expressly unprotected. Bonito Boats, 489 U.S. at 152, 109 S.Ct. at 978.
The defendants seize upon this citation to Sears and Comyco as a reaffirmation of the sweeping preemption principles for which these cases were once read to stand. They argue that Midler was wrongly decided because it ignores these two decisions, an omission that the defendants say indicates an erroneous assumption that Sears and Comyco have been “relegated to the constitutional junkyard.” Thus, the defendants go on to reason, earlier cases that rejected entertainers’ challenges to imitations of their performances based on federal copyright preemption, were correctly decided because they relied on Sears and Compco. See Sinatra v. Goodyear Tire & Rubber Co., 435 F.2d 711, 716-18 (9th Cir. 1970), cert. denied, 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 646 (1971); Booth v. Colgate-Palmolive Co., 362 F.Supp. 343, 348 (S.D.N.Y.1973); Davis v. Trans World Airlines, 297 F.Supp. 1145, 1147 (C.D.Cal.1969). This reasoning suffers from a number of flaws.
Bonito Boats itself cautions against reading Sears and Comyco for a “broad pre-emptive principle” and cites subsequent Supreme Court decisions retreating from such a sweeping interpretation. “[T]he Patent and Copyright Clauses do not, by their own force or by negative implication, deprive the States of the power to adopt rules for the promotion of intellectual creation.” Bonito Boats, 489 U.S. at 165, 109 S.Ct. at 985 (citing, inter alia, Goldstein v. California, 412 U.S. 546, 552-61, 93 S.Ct. 2303, 2307-08, 37 L.Ed.2d 163 (1973) and Kewanee Oil Co. v. Bicron Corp., 416 U.S. 470, 478-79, 94 S.Ct. 1879, 1885, 40 L.Ed.2d 315 (1974)). Instead, the Court reaffirmed the right of states to “place limited regulations on the use of unpatented designs in order to prevent consumer confusion as to source.” Id. Bonito Boats thus cannot be read as endorsing or resurrecting the broad reading of Compco and Sears urged by the defendants, under which Waits’ state tort claim arguably would be preempted.
Moreover, the Court itself recognized the authority of states to protect entertainers’ “right of publicity” in Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). In *1100 Zacchini, the Court endorsed a state right-of-publicity law as in harmony with federal patent and copyright law, holding that an unconsented-to television news broadcast of a commercial entertainer’s performance was not protected by the First Amendment. Id. at 573, 576-78, 97 S.Ct. at 2856, 2858-59. The cases Frito asserts were “rightly decided” all predate Zacchini and other Supreme Court precedent narrowing Sears’ and Compeo’s sweeping preemption principles. In sum, our holding in Midler, upon which Waits’ voice misappropriation claim rests, has not been eroded by subsequent authority.
The defendants ask that we rethink Mi-dler anyway, arguing as the defendants did there that voice misappropriation is preempted by section 114 of the Copyright Act. Under this provision, a state cause of action escapes Copyright Act preemption if its subject matter “does not come within the subject matter of copyright ... including works or authorship not fixed in any tangible medium of expression.” 17 U.S.C. § 301(b)(1). We rejected copyright preemption in Midler because voice is not a subject matter of copyright: “A voice is not copyrightable. The sounds are not ‘fixed.’ ” Midler, 849 F.2d at 462. As a three-judge panel, we are not at liberty to reconsider this conclusion, and even if we were, we would decline to disturb it.
Waits’ claim, like Bette Midler’s, is for infringement of voice, not for infringement of a copyrightable subject such as sound recording or musical composition. Moreover, the legislative history of section 114 indicates the express intent of Congress that “[t]he evolving common law rights of ‘privacy,’ ‘publicity,’ and trade secrets ... remain unaffected [by the preemption provision] as long as the causes of action contain elements, such as an invasion of personal rights ... that are different in kind from copyright infringement.” H.R.Rep. No. 1476, 94th Cong., 2d Sess. 132, reprinted in 1976 U.S.C.C.A.N. 5659, 5748. Waits’ voice misappropriation claim is one for invasion of a personal property right: his right of publicity to control the use of his identity as embodied in his voice. See Midler, 849 F.2d at 462-63 (“What is put forward as protectable here is more personal than any work of authorship____ A voice is as distinctive and personal as a face.”) The trial’s focus was on the elements of voice misappropriation, as formulated in Midler: whether the defendants had deliberately imitated Waits’ voice rather than simply his style and whether Waits’ voice was sufficiently distinctive and widely known to give him a protectable right in its use. These elements are “different in kind” from those in a copyright infringement case challenging the unauthorized use of a song or recording. Waits’ voice misappropriation claim, therefore, is not preempted by federal copyright law.
B. Jury Instructions
The defendants next contend that the district court committed prejudicial error by rejecting their proposed jury instructions on three elements of the Midler tort: the deliberate misappropriation for commercial purposes of (1) a voice, that is (2) distinctive and (3) widely known. We consider jury instructions as a whole to determine if they are misleading or inadequate. United States v. Beltran-Rios, 878 F.2d 1208, 1214 (9th Cir.1989). We review challenges to the formulation of jury instructions for abuse of discretion. Id. Whether a jury instruction misstates the elements that must be proved at trial, however, is a question of law which we review de novo. United States v. Spillone, 879 F.2d 514, 525 (9th Cir.1989), cert. denied, — U.S. —,—, 111 S.Ct. 173, 210, 112 L.Ed.2d 137, 170 (1990).
(1) “Voice” vs. “Style”
The defendants argued at trial that although they had consciously copied Tom Waits’ style in creating the Doritos commercial, they had not deliberately imitated his voice. They accordingly proposed a jury instruction which distinguished in detail between voice, which is protected under Midler, and style, which is not.[2] The dis *1101 trict court rejected this instruction. Instead, its instructions on voice misappropriation track closely the elements of the tort as formulated in Midler. The court’s instruction directed the jury to decide whether Waits’ voice is distinctive, whether his voice is widely known, and whether the defendants had deliberately imitated his voice.
The defendants argue that their proposed “style” instruction was crucial because of the deliberate stylistic similarities between the Doritos commercial and “Step Right Up” and because in instructing the jury on Waits’ Lanham Act claim, the court told the jury that it could consider Waits’ singing style, songwriting style, and manner of presentation. In failing to give their proposed instruction, the defendants contend, the court misled the jury into believing that it could also consider the defendants’ admitted imitation of Waits’ style in determining liability for voice misappropriation.
We disagree because, read as a whole, the instructions were not misleading. In charging the jury, the court repeatedly noted that two claims were presented for determination and gave separate instructions on each claim. The court's voice misappropriation instructions limited the jury’s consideration to voice, and in no way implied that it could consider style. Indeed, in addressing the jury in closing argument, Waits’ attorney agreed with the defendants that style was not protected. Moreover, the court included an additional instruction that effectively narrowed the jury’s focus to Waits’ voice and indicated that style imitation alone was insufficient for tort liability. For the defendants to be liable for voice misappropriation, the court stated, the imitation had to be so good that “people who were familiar with plaintiff’s voice who heard the commercial believed plaintiff performed it. In this connection it is not enough that they were reminded of plaintiff or thought the singer sounded like plaintiff____”[3] (Emphasis added.) Even if the jury were initially confused about whether the defendants could be liable simply for imitating Waits’ style, this instruction would have disabused them of this notion.
(2) Definition of “Distinctive”
The defendants next argue that the court’s instruction concerning the meaning of “distinctive” was an unfair and inaccurate statement of the law because it confuses the “distinctiveness” of a voice with its identifiability or recognizability. The instruction given states in part: “A voice is distinctive if it is distinguishable from the voices of other singers____if it has particular qualities or characteristics that identify it with a particular singer.” At trial the defendants’ experts testified that identifia-bility depends, not on distinctiveness, but on the listener’s expectations; that distinctiveness and recognizability are not the same thing; and that recognizability is enhanced by style similarity. The defendants argue that these theories were inadequately dealt with by the court’s instruction and that because anyone’s voice is identifiable by someone, it was error for the court not to make clear the difference between distinctiveness and identifiability. We disagree.
*1102 The defendants’ technical argument that distinctiveness is a separate concept from identifiability, while supported by their experts’ testimony, has no basis in law. Identifiability is properly considered in evaluating distinctiveness, for it is a central element of a right of publicity claim. See Publicity and Privacy § 3.4[A] & n. 1 (citing cases). Our Midler holding is premised on the fact that a person is as identifiable by voice as by any other indicia of identity previously recognized as protectable. Although we did not define “distinctiveness” in Midler, we stated: “A voice is as distinctive and personal as a face. The human voice is one of the most palpable ways identity is manifested. We are all aware that a friend is at once known by a few words on the phone____[T]hese observations hold true of singing...” Midler v. Ford, 849 F.2d at 463 (emphasis added). See also Motschenbacher, 498 F.2d at 826-27 (rejecting trial court’s ruling that because plaintiff’s face was not recognizable in advertisement photograph, his identity had not been misappropriated, and finding that plaintiff was identifiable from distinctive decorations on race car).
The court’s “distinctiveness” instruction informed the jury that it could consider the recordings of Waits’ voice introduced into evidence and the testimony of expert and other witnesses. The court thus invited members of the jury to use their common sense in determining whether Waits has a distinctive enough voice to warrant protection, and to consider as well what the experts had to say. This was entirely appropriate. See Publicity and Privacy, § 3.4[C] (jury must use “common sense ... guided by the weight of the evidence” in determining minimum threshold of identifiability in right of publicity actions). The court was not required to formulate instructions endorsing expert opinions which lacked legal foundation. Finally, we are unpersuaded by the defendants’ argument that the court’s instruction would have allowed the jury to hold them liable for imitation of a voice that was identifiable by only a small number of people, inasmuch as Midler also requires that the plaintiff’s voice be “widely known.”
(3) Definition of “Widely Known”
The defendants next object to the district court’s instruction concerning the element of “widely known” on the ground that it was too vague to guide the jury in making a factual determination of the issue. The court instructed the jury: “A professional singer’s voice is widely known if it is known to a large number of people throughout a relatively large geographic area.” (Emphasis added.) The court rejected an instruction proposed by the defendants, which reflected their contention at trial that Tom Waits is a singer known only to music insiders and to a small but loyal group of fans: “A singer is not widely known if he is only recognized by his own fans, or fans of a particular sort of music, or a small segment of the population.”
The legal underpinnings of this proposed instruction are questionable. The defendants assert that because Waits has not achieved the level of celebrity Bette Midler has, he is not well known under the Midler standard. We reject this crabbed interpretation of Midler. The defendants’ proposed instruction would have excluded from legal protection the voices of many popular singers who fall short of superstardom. “Well known” is a relative term, and differences in the extent of celebrity are adequately reflected in the amount of damages recoverable. See Motschenbacher, 498 F.2d at 824 n. 11 (“Generally, the greater the fame or notoriety of the identity appropriated, the greater will be the extent of the economic injury suffered.”). Moreover, even were these instructions inadequate in some regard the error would be harmless, for we agree with the district court that the “great weight of evidence produced at trial indicates that Tom Waits is very widely known.”
In sum, we find no error in the instructions given to the jury on Waits’ voice misappropriation claim!
C. Compensatory Damage Award
The jury awarded Waits the following compensatory damages for voice misappro *1103 priation: $100,000 for the fair market value of his services; $200,000 for injury to his peace, happiness and feelings; and $75,000 for injury to his goodwill, professional standing and future publicity value. The defendants contest the latter two awards, disputing both the availability of such damages in a voice misappropriation action and the sufficiency of the evidence supporting the awards.
1. Injury to Peace, Happiness and Feelings
The defendants argue that in right of publicity actions, only damages to compensate for economic injury are available. We disagree. Although the injury stemming from violation of the right of publicity “may be largely, or even wholly, of an economic or material nature,” we have recognized that “it is quite possible that the appropriation of the identity of a celebrity may induce humiliation, embarrassment, and mental distress.” Motschenbacher, 498 F.2d at 824 & n. 11. Contrary to the defendants’ assertions, Midler neither discussed nor limited the damages recoverable in a voice misappropriation action. Midler makes reference to the market value of Midler’s voice solely to support its conclusion that her voice has economic value and, therefore, is a protectable property right. See 849 F.2d at 463.
In assessing the propriety of mental distress damages, our focus is properly directed to the nature of the infringement and its embarrassing impact on the plaintiff. Publicity and Privacy § 4.2[A]. Often the objectionable nature of the use will cause mental distress. Id. § 4.2[B], [C], [D] (discussing cases). In Grant v. Esquire, Inc., 367 F.Supp. 876 (S.D.N.Y.1973), for example, the court found that the mere use of a celebrity’s identity could cause embarrassment for which mental distress damages would be available. The case involved a suit by Cary Grant against Esquire magazine for publishing a photograph in which Grant’s head was superimposed on a clothing model’s torso. Like Waits, Grant had taken a public position against reaping commercial profits from the publicity value of his identity. Id. at 880. The court, after finding that Grant had a protectable right of publicity, noted that “[i]f the jury decides in plaintiff Grant’s favor he will of course be entitled to recover for any lacerations to his feelings that he may be able to establish” in addition to the fair market value of use of his identity. Id. at 881. Given the evidence that the commercial use of his voice was particularly offensive to Waits, we conclude that Waits’ prayer for mental distress damages was properly submitted to the jury.
The defendants argue, however, that merely taking offense is an insufficient basis for awarding mental distress damages, and that under California' law the evidence was insufficient to support the award. In California, mental distress damages may be recovered for “shame, humiliation, embarrassment, [and] anger.” Young v. Bank of America, 141 Cal. App.3d 108, 114, 190 Cal.Rptr. 122 (1983); see also Moore v. Greene, 431 F.2d 584, 591 & n. 3 (9th Cir.1970) (damages available for anxiety, humiliation and indignity). Waits testified that when he heard the Doritos commercial, “this corn chip sermon,” he was shocked and very angry. These feelings “grew and grew over a period of a couple of days” because of his strong public opposition to doing commercials. Waits testified, “[I]t embarrassed me. I had to call all my friends, that if they hear this thing, please be informed this is not me. I was on the phone for days. I also had people calling me saying, Gee, Tom, I heard the new Doritos ad.” Added to this evidence of Waits’ shock, anger, and embarrassment is the strong inference that, because of his outspoken public stance against doing commercial endorsements, the Doritos commercial humiliated Waits by making him an apparent hypocrite. This evidence was sufficient both to allow the jury to consider mental distress damages and to support their eventual award.
2. Injury to Goodwill and Future Publicity Value
The defendants next argue that reputa-tional damages are available only in defa *1104 mation actions and that since Waits did not allege or prove defamation, they were unavailable here. Further, they argue, there was no evidence to support the award of such damages because Waits did not show that his career had suffered. Again, we reject these contentions.
We have no doubt, in light of general tort liability principles, that where the misappropriation of identity causes injury to reputation, compensation for such injury is appropriate. See Cal.Civ.Code § 3333 (West 1970) (available damages are those “which will compensate for all of the detriment” caused by defendant’s tortious conduct). Reputational damages, moreover; have been awarded in right of publicity cases. See Clark v. Celeb Publishing, Inc., 530 F.Supp. 979, 984 (S.D.N.Y.1981) (applying California law); Hirsch v. S.C. Johnson & Son, Inc., 90 Wis.2d 379, 280 N.W.2d 129, 138 (1979). The central issue is not whether these damages were available, but whether the evidence was sufficient to establish injury to Waits’ reputation. As we noted above, the jury could have inferred from the evidence that the commercial created a public impression that Waits was a hypocrite for endorsing Doritos. Moreover, it also could have inferred damage to his artistic reputation, for Waits had testified that “part of my character and personality and image that I have cultivated is that I do not endorse products.” Finally, from the testimony of Waits’ expert witness, the jury could have inferred that if Waits ever wanted to do a commercial in the future, the fee he could command would be lowered by $50,000 to $150,000 because of the Doritos commercial. This evidence was sufficient to support the jury’s award of $75,000 for injury to Waits’ goodwill and future publicity value.
D. Punitive Damage Award
The jury awarded Waits a total of $2 million in punitive damages for voice misappropriation: $1.5 million against Tracy-Locke and $500,000 against Frito-Lay. The defendants ask that we vacate this award, arguing that punitive damages are unavailable as a matter of law, and alternatively, that the evidence was insufficient to support their award.[4]
In California, exemplary or punitive damages are available “where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice.” Cal.Civ.Code § 3294(a) (West Supp.1992). The statute defines “malice” in pertinent part as “despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others.” Id. § 3294(c)(1) (emphasis added). The defendants contend that because Midler was so recently decided and so imprecise in''the scope of its holding, they could not have been aware of the rights they were infringing upon in broadcasting the commercial. Thus, they reason, their conduct was not in “conscious disregard” of Waits’ property right in his voice.
Where an issue is one of first impression or where a right has not been clearly established, punitive damages are generally unavailable. See, e.g., Morgan Guar. Trust Co. v. American Sav. & Loan Ass’n, 804 F.2d 1487, 1500 (9th Cir.1986), cert. denied, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); Bartling v. Glendale Adventist Medical Center, 184 Cal.App.3d 961, 229 Cal.Rptr. 360, 364 (1986). The right of a well-known professional singer to control the commercial use of a distinctive voice, however, was not an “issue of first impression” in this case. The right had been established clearly by Midler. The evidence was unequivocal that, although Midler was decided just three months before the conduct at issue, Tracy-Locke personnel responsible for making the Doritos commercial were familiar with the Midler decision. Tracy-Locke was con *1105 cerned enough that the commercial could result in voice misappropriation liability that it cautioned Frito-Lay of the legal risks in choosing the Carter version. At the same time, however, Tracy-Locke stated its readiness to indemnify Frito-Lay against damages. Frito-Lay, reassured by the indemnification, chose to proceed with the Carter version. In going forward with the commercial, the defendants knowingly took a calculated risk, thereby consciously disregarding the effect of these actions on Waits’ legally recognized rights.
The defendants argue, however, that although they may have been aware that legal risks were involved, they had a good faith belief that Waits’ rights would not be infringed because they read the legal precedents differently. This argument leaves us unpersuaded. Good faith cannot be manufactured by looking to the law of other jurisdictions to define the rights of California residents. Midler could not be more clear that, in California at least, a well-known singer with a distinctive voice has a property right in that voice. Waits is a California resident, a fact of which Tracy-Locke personnel were aware. The defendants made a conscious decision to broadcast a vocal performance imitating Waits in markets across the country, including San Francisco and Los Angeles. This evidence is sufficient to raise at least a prima facie showing that defendants acted in conscious disregard of rights recognized in California.
Even if punitive damages are available, the defendants argue, the award must be vacated because it is not supported by clear and convincing evidence, as required by California law. Cal.Civ.Code § 3294(a). Clear and convincing evidence means evidence sufficient to support a finding of “high probability.” Mock v. Michigan Millers Mutual Ins. Co., 4 Cal.App.4th 306, 5 Cal.Rptr.2d 594, 610 (1992). On appeal, we must determine whether, viewing the evidence in the light most favorable to Waits, any rational jury could have found a high probability that the defendants acted with malice, i.e., despicably and with willful and conscious disregard of Waits’ rights. See Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1013-14 (9th Cir.1985) (evidence supports civil jury verdict if there is “such relevant evidence as a reasonable mind might accept as adequate to support a conclusion”), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); cf. United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir.1988) (evidence supports criminal conviction if, viewed in light most favorable to prosecution, any rational jury could find elements of crime beyond a reasonable doubt).
The evidence the jury heard included testimony that Carter, the Waits’ impersonator, told Brenner that Waits had a policy against doing commercials and would not like this one. Brenner knew of Waits’ policy because he had tried unsuccessfully to hire him for another commercial. In the face of Brenner’s warnings that the commercial sounded too much like Waits and presented serious legal concerns, Grossman called a lawyer. Although the lawyer thought the scenario Grossman painted him did not present a colorable legal problem, Grossman had not told the lawyer that the commercial featured a voice that sounded like Waits — only that the “feeling” of the music was the same. Grossman urged Frito-Lay to choose the Carter version over one that did not sound like Waits. Moreover, at the same time Grossman disclosed the legal risk involved with the Carter version, he stated that Tracy-Locke would indemnify Frito-Lay in the event of a lawsuit. The responsible Frito-Lay executive, who was also familiar with Waits and his background, chose to go with the Carter version. The effect of their actions on Waits, according to his testimony, was to tarnish the artistic integrity which he had striven to achieve.
We believe that, viewed most favorably to Waits, this evidence was adequate to support a finding of high probability that Tracy-Locke and Frito-Lay acted with malice. Despicability reflects a moral judgment, “conscious disregard” a state of mind. A rational jury could have found the defendants’ conduct despicable because they knowingly impugned Waits’ integrity in the public eye. A rational jury also *1106 could have found that the defendants, in spite of their awareness of Waits’ legal right to control the commercial use of his voice, acted in conscious disregard of that right by broadcasting the commercial. We therefore affirm the award of punitive damages.
II. Lanham Act Claim
Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), prohibits the use of false designations of origin, false descriptions, and false representations in the advertising and sale of goods and services. Smith v. Montoro, 648 F.2d 602, 603 (9th Cir.1981). Waits’ claim under section 43(a) is premised on the theory that by using an imitation of his distinctive voice in an admitted parody of a Tom Waits song, the defendants misrepresented his association with and endorsement of SalsaRio Doritos. The jury found in Waits’ favor and awarded him $100,000 in damages. The district court also awarded him attorneys’ fees under section 35 of the Lanham Act. On appeal, the defendants argue that Waits lacks standing to bring a Lanham Act claim, that Waits’ false endorsement claim fails on its merits, that the damage award is duplicative, and that attorneys’ fees are improper. Before we address these contentions, however, we turn to the threshold issue of whether false endorsement claims are properly cognizable under section 43(a) of the Lanham Act,[5] a question of first impression in this circuit.[6]
A. False Endorsement
At the time of the broadcast of the Doritos commercial, section 43(a) provided in pertinent part:
Any person who shall affix, apply, or annex, or use in connection with any goods or services ... a false designation of origin, or any false designation or representation ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false designation or representation.
15 U.S.C. § 1125 note (Amendments) (1988). Courts in other jurisdictions have interpreted this language as authorizing claims for false endorsement. E.g., Better Business Bureau v. Medical Directors, Inc., 681 F.2d 397 (5th Cir.1982); Jackson v. MPI Home Video, 694 F.Supp. 483 (N.D.Ill.1988); Wildlife Internationale, Inc. v. Clements, 591 F.Supp. 1542 (S.D.Oh.1984); Geisel v. Poynter Prods., Inc., 283 F.Supp. 261, 267 (S.D.N.Y.1968). Moreover, courts have recognized false endorsement claims brought by plaintiffs, including celebrities, for the unauthorized imitation of their distinctive attributes, where those attributes amount to an unregistered commercial “trademark.” See Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2d Cir.1979) (recognizing claim under § 43(a) because uniform worn by star of X-rated movie was confusingly similar to plaintiffs’ trademark uniforms, falsely creating impression that plaintiffs “sponsored or otherwise approved the use” of the uniform); Allen v. Men’s World Outlet, Inc., 679 F.Supp. 360, 368 (S.D.N.Y.1988) (celebrity states a claim under § 43(a) by showing that advertisement featuring photograph of a look-alike falsely represented that advertised products were associated with him); Allen v. National Video, Inc., 610 F.Supp. 612, 625-26 (S.D.N.Y.1985) (recognizing celebrity’s false endorsement claim under § 43(a) because celebrity has commercial investment in name and face tantamount to interests of a trademark holder in distinctive mark); see also Lahr v. Adell Chemical Co., 300 F.2d 256, 258 (1st Cir.1962) (imitation of unique voice actionable as common law unfair competition); cf. Sinatra v. *1107 Goodyear Tire & Rubber Co., 435 F.2d 711, 716 (9th Cir.1970) (rejecting common law unfair competition claim because plaintiffs voice not sufficiently unique to be protectable), cert. denied, 402 U.S. 906, 91 S.Ct. 1376, 28 L.Ed.2d 646 (1971).
The persuasiveness of this case law as to the cognizability of Waits’ Lanham Act claim is reinforced by the 1988 Lanham Act amendments. See Trademark Law Revision Act of 1988, Pub.L. 100-667, § 132, 102 Stat. 3935, 3946. The legislative history states that the amendments to section 43(a) codify previous judicial interpretation given this provision. S.Rep. No. 515, 100th Cong., 2d Sess., at 40, reprinted in 1988 U.S.C.C.A.N. 5577, 5603. Although these amendments did not take effect until November 1989, approximately a year after the broadcast of the defendants’ Doritos commercial, as a codification of prior, case law and in the absence of controlling precedent to the contrary, they properly inform our interpretation of the previous version of section 43(a). Specifically, we read the amended language to codify case law interpreting section 43(a) to encompass false endorsement claims. Section 43(a) now expressly prohibits, inter alia, the use of any symbol or device which is likely to deceive consumers as to the association, sponsorship, or approval of goods or services by another person.[7] Moreover, the legislative history of the 1988 amendments also makes clear that in retaining the statute’s original terms “symbol or device” in the definition of “trademark,” Congress approved the broad judicial interpretation of these terms to include distinctive sounds and physical appearance. See S.Rep. No. 101-515 at 44, 1988 U.S.C.C.A.N. at 5607. In light of persuasive judicial authority and the subsequent congressional approval of that authority, we conclude that false endorsement claims, including those premised on the unauthorized imitation of an entertainer’s distinctive voice, are cognizable under section 43(a).
B. Standing
According to the defendants, however, Waits lacks standing to sue for false endorsement. They assert that because he is not in competition with the defendants, he cannot sue under the Lanham Act. Common sense contradicts this argument, for the purported endorser who is commercially damaged by the false endorsement will rarely if ever be a competitor, and yet is the party best situated to enforce the Lan-ham Act’s prohibition on such conduct. Our circuit precedent, however, throws into question whether such a plaintiff must be a competitor of the defendant’s in order to sue under section 43(a).
In Smith v. Montoro, 648 F.2d 602 (9th Cir.1981), we declined to restrict standing under the Lanham Act to competitors. The plaintiff in Smith, an actor who had played a starring role in a movie, sued a film distributor when it replaced his name with another actor’s name in the movie’s credits and advertising. Id. at 603. We characterized the section 43(a) claim there as a “reverse passing off” claim, because the plaintiff’s “mark” — his name — had been removed and another’s substituted. We analogized this conduct to trademark infringement, because the injury involved was “of the same economic nature.” See id. at 606-07 (quoting Truck Equipment Serv. Co. v. Fruehauf Corp., 536 F.2d 1210, 1216 (8th Cir.), cert. denied, 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976)). Like trademark infringement, the film distribu *1108 tor’s conduct was “an attempt to misappropriate or profit from [the plaintiff’s] talents and workmanship.” Id. at 607 (citations omitted).
To have standing under the Lanham Act, we declared, “the plaintiff need not be in actual competition with the alleged wrongdoer.” Smith, 648 F.2d at 607. Rather, the “dispositive question” in determining standing is whether the plaintiff “has a reasonable interest to be protected against false advertising.” Id. at 608 (quoting 1 R. Callman, Unfair Competition, Trademarks and Monopolies, § 18.2(b), at 625 (3d ed. 1967) and citing New West Corp. v. NYM Co. of Calif., Inc., 595 F.2d 1194, 1198 (9th Cir.1979)). We concluded that, like a trademark holder, an actor has a “reasonable interest” in having his work product properly identified with his name, and therefore the plaintiff had standing under section 43(a). See id.
On the other hand, in Halicki v. United Artists Communications, Inc., 812 F.2d 1213 (9th Cir.1987), we dismissed the plaintiff’s claim because he had failed to show competitive injury. The plaintiff, a movie producer, had entered into a contract with a film distributor under which the plaintiff’s movie would be advertised with a “PG” rating. Instead, it was advertised with an “R” rating, thus curtailing its market among young audiences. Id. at 1213. The gravamen of the complaint was that the defendant had misrepresented the film’s content in advertising it. We rejected the plaintiff’s contention that to state a claim under the Lanham Act, all he need do was “show that the defendants made a false representation about his film and that he was injured by the representation.” Id. at 1214. Rather, the plaintiff must also show that type of injury sustained is one the Lanham Act is intended to prevent.
We noted that an express purpose of the Lanham Act is to protect commercial parties against unfair competition. Id. Thus, we held that “[t]o be actionable, [the defendant’s] conduct must not only be unfair but must in some discernible way be competitive.” Id. The misrepresentation as to the film’s rating, we concluded, while possibly actionable as breach of contract, was not actionable under the Lanham Act inasmuch as the plaintiff had not been injured by a competitor. Id. at 1214-15. This result, we stated, accords with congressional intent, for if such a limitation were not in place the Lanham Act would become a “federal statute creating the tort of misrepresentation.” Id. at 1214.
To interpret Halicki as suggested by the defendants, for the broad proposition that only competitors have standing under section 43(a) regardless of the type of claim asserted, would create an impermissible conflict with Smith, where we held that actual competition is unnecessary. See Smith, 648 F.2d at 607-08. Where circuit precedent appears in conflict, we must attempt to reconcile it; if we cannot do so consideration en banc is appropriate. See Atonio v. Wards Cove Packing Co., 810 F.2d 1477, 1478-79 (9th Cir.1987) (en banc). We find that Smith and Halicki may be reconciled, and we begin with the basic principle both embody: that standing under section 43(a) exists where the interest asserted by the plaintiff is a commercial interest protected by the Lanham Act.
Its drafters wrote the purposes of the Lanham Act, two of which áre relevant here, into the statute itself: to make “actionable the deceptive and misleading use of marks in ... commerce” and “to protect persons engaged in ... commerce against unfair competition.” 15 U.S.C. § 1127 (1988). Section 43(a) reflects both of these purposes, providing two bases of liability: (1) false representations concerning the origin, association, or endorsement of goods or services through the wrongful use of another’s distinctive mark, name, trade dress, or other device (“false association”), and (2) false representations in advertising concerning the qualities of goods or services (“false advertising”). See, e.g., 2 J. Thomas McCarthy, Trademarks and Unfair Competition §§ 27:2-27:4, at 344-68 (2d ed. 1984) (discussing two prongs of section 43(a)); U-Haul Int’l, Inc. v. Jartran, Inc., 681 F.2d 1159, 1160 (9th Cir.1982) (discussing trademark infringement and false comparative advertising as two distinct causes of action under § 43(a)); *1109 Spring Mills, Inc. v. Ultracashmere House, Ltd., 532 F.Supp. 1203, 1220 (S.D.N.Y.) (discussing false association and false advertising), rev’d on other grounds, 689 F.2d 1127 (2d Cir.1982). Halicki and Smith are distinguishable, because they involve different prongs of section 43(a) liability and implicate distinct interests. Cf. Halicki, 812 F.2d at 1214 (distinguishing Smith on the basis of type of claim asserted).
We have recognized that simple claims of false representations in advertising are actionable under section 43(a) when brought by competitors of the wrongdoer, even though they do not involve misuse of a trademark. See U-Haul, 681 F.2d at 1160-61. The plaintiff’s claim in Halicki was exclusively such a “false advertising” claim, for it sought redress for a simple misrepresentation as to a product’s quality, the content of a movie.[8] We were at pains to point out that the plaintiff’s injury was not related to the Lanham Act’s purpose of preventing the “deceptive and misleading use of marks,” 15 U.S.C. § 1127, declaring that the statute’s purposes with regard to the use of trademarks were irrelevant to his claim. See Halicki, 812 F.2d at 1214. Rather, where the misrepresentation simply concerns a product’s qualities, it is actionable under section 43(a) only insofar the Lanham Act’s other purpose of preventing “unfair competition” is served. See U-Haul, 681 F.2d at 1162 (noting congressional intent to allow false advertising suits by competitors “to stop the kind of unfair competition that consists of lying about goods or services”). In such cases, Halicki counsels that a discernibly competitive injury must be alleged. We take an example close to Halicki s facts, assuming for purposes of this hypothetical only that producers may rate their own films. If a film’s distributor wrongfully indicates that a film is “PG”-rated when in reality it should be “R”-rated, a competitor with a PG-rated film would have standing: the misrated film theoretically draws young audiences away from the competitor’s film because of the misrepresentation concerning the suitability of its content. In Hal-icki, however, the plaintiff lacked a discernibly competitive interest: he and the distributor were not independent actors in the marketplace, but rather had a contractual relationship in which the distributor agreed to act in the marketplace on the plaintiff’s behalf. The interests asserted, therefore, were solely contractual and. not within the zone of interests protected by the Lanham Act.
The plaintiff’s claim in Smith, on the other hand, was a type of false association claim stemming from the misuse of a mark, for it alleged the wrongful removal of the plaintiff’s name and the wrongful substitution of another’s name. Smith teaches that where such a claim is presented, the plaintiff need not be a competitor, for the Lanham Act also grants a cause of action to certain noncompetitors who have been injured commercially by the “deceptive and misleading use of marks.” See 15 U.S.C. § 1127; see also Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 467 F.Supp. 366, 374 (S.D.N.Y. 1979) (owner of a mark has right to exploit mark commercially by having consumers associate mark only with owner’s goods or services, regardless of whether misappropriator deals in competing or noncompeting goods or services). Those with standing to bring such a claim include parties with a commercial interest in the product wrongfully identified with another’s mark, as in Smith, or with a commercial interest in the misused mark.[9] See Dovenmuehle v. Gill- *1110 dorn Mortgage Midwest Corp., 871 F.2d 697, 700-01 (7th Cir.1989) (only those with present comfnercial interest in trade name have standing to sue for its wrongful use under § 43(a)); Berni Int’l Gourmet Restaurants of America, Inc,, 838 F.2d 642, 648 (2d Cir.1988) (plaintiff must have commercial or ownership interest in mark to have standing under § 43(a)); cf. Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205, 62 S.Ct. 1022, 1024, 86 L.Ed. 1381 (1942) (“If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.”).
A false endorsement claim based on the unauthorized use of a celebrity’s identity is a type of false association claim, for it alleges the misuse of a trademark, i.e., a symbol or device such as a visual likeness, vocal imitation, or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff’s sponsorship or approval - of the product. Standing, therefore, does not require “actual competition” in the traditional sense; it extends to a purported endorser who has an economic interest akin to that of a trademark holder in controlling the commercial exploitation of his or her identity. See Allen v. National Video, 610 F.Supp. at 625, 628 (celebrity’s interest in the marketing value of his identity is similar to that of a trademark holder, and its misuse through evocation of celebrity’s persona that creates likelihood of consumer confusion as to celebrity’s endorsement is actionable under Lanham Act). Moreover, the wrongful appropriator is in a sense a competitor of the celebrity, even when the celebrity has chosen to disassociate himself or herself from advertising products as has Waits. They compete with respect to the use of the celebrity’s name or identity. They are both utilizing or marketing that personal property for commercial purposes. Accordingly, we hold that a celebrity whose endorsement of a product is implied through the imitation of a distinctive attribute of the celebrity’s identity, has standing to sue for false endorsement under section 43(a) of the Lanham Act.[10] Tom Waits, therefore, need not be a competitor in the traditional sense to sue under the Lanham Act for the imitation of his voice on the theory that its use falsely associated him with Doritos as an endorser. Rather, his standing was sufficiently established by the likelihood that the wrongful use of his professional trademark, his unique voice, would injure him commercially.
C. Merits
The defendants next argue that Waits’ false endorsement claim must fail on its merits because the Doritos commercial “did not represent that ... [Waits] sponsored or endorsed their product.” We disagree. The court correctly instructed the jury that *1111 in considering Waits’ Lanham Act claim, it must determine whether “ordinary consumers ... would be confused as to whether Tom Waits sang on the commercial ... and whether he sponsors or endorses SalsaRio Doritos.” The jury was told that in making this determination, it should consider the totality of the evidence, including the distinctiveness of Waits’ voice and style, the evidence of actual confusion as to whether Waits actually sang on the commercial, and the defendants’ intent to imitate Waits’ voice. See generally, Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir.) (discussing factors to be considered in determining likelihood of confusion, including strength of mark, similarity of marks, evidence of actual confusion, marketing channels used, and intent in selecting marks), cert. denied, 493 U.S. 872, 110 S.Ct. 202, 107 L.Ed.2d 155 (1989).
At trial, the jury listened to numerous Tom Waits recordings, and to a recording of the Doritos commercial in which the Tom Waits impersonator delivered this “hip” endorsement of SalsaRio Doritos: “It’s buffo, boffo, bravo, gung-ho, tally-ho, but never mellow____ try’ em, buy ’em, get ’em, got ’em.” The jury also heard evidence, relevant to the likelihood of consumer confusion, that the Doritos commercial was targeted to an audience which overlapped with Waits’ audience, males between the ages of 18 to 35 who listened to the radio. Finally, there was evidence of actual consumer confusion: the testimony of numerous witnesses that they actually believed it was Tom Waits singing the words of endorsement.
This evidence was sufficient to support the jury’s finding that consumers were likely to be misled by the commercial into believing that Waits endorsed SalsaRio Doritos. See Allen v. Men’s World Outlet, 679 F.Supp. at 368-69 (likelihood of consumer confusion established where advertiser intentionally used a look-alike of well-known celebrity and where audience to whom commercial was directed intersected with celebrity’s audience); Allen v. National Video, 610 F.Supp. at 626-27 & n. 8 (use of celebrity look-alike in pose of product spokesperson sufficient to indicate endorsement). The jury’s verdict on Waits’ Lanham Act claim must therefore stand.
D. Damages
The defendants urge us to vacate the damage award on Waits’ Lanham Act claim as duplicative of those damages awarded for voice misappropriation representing the fair market value of Waits’ services. Waits does not contest this point. Standing by the representations he made to the jury at trial that he was not seeking a double recovery, he asserts on appeal that he “does not oppose a reduction of the final judgment in the amount of $100,000 based on the overlapping Lanham Act award.”
In instructing the jury on Waits’ Lanham Act claim, the court stated that it could award damages for the fair market value of Waits’ services. The jury awarded Waits $100,000 on this claim. It also awarded Waits $100,000 for the fair market value of his services on his voice misappropriation claim. The damages awarded under the Lanham Act, therefore, are du-plicative. Accordingly, we vacate this portion of the judgment.
E. Attorneys’ Fees
Section 35 of the Lanham Act authorizes attorneys’ fee awards for prevailing plaintiffs in “exceptional cases.” 15 U.S.C. § 1117. Exceptional cases include those in which the defendants’ conduct is “malicious, fraudulent, deliberate, or wilful.” Sealy, Inc. v. Easy Living, Inc., 743 F.2d 1378, 1384 (9th Cir.1984) (citing S.Rep. No. 1400, 93rd Cong., 2d Sess. (1974), reprinted in 1974 U.S.C.C.A.N. 7132); see Transgo, 768 F.2d at 1026. We review attorneys’ fee awards under the Lanham Act for abuse of discretion. Transgo, 768 F.2d at 1026.
In awarding punitive damages on Waits’ voice misappropriation claim, the jury specifically found that the defendants had acted with oppression, fraud, or malice. That finding qualifies this case as an exceptional one within the meaning of section 35. The district court was therefore within its *1112 discretion in awarding Waits reasonable attorneys’ fees.
CONCLUSION
Waits’ voice misappropriation claim and his Lanham Act claim are legally sufficient. The court did not err in instructing the jury on elements of voice misappropriation. The jury’s verdict on each claim is supported by substantial evidence, as are its damage awards. Its award of damages on Waits’ Lanham Act claim, however, is du-plicative of damages awarded for voice misappropriation; accordingly we vacate it. Finally, the court did not abuse its discretion in awarding attorneys’ fees under the Lanham Act.
Waits is awarded his costs on appeal.
AFFIRMED in part and VACATED in part.

. Waits characterizes the song as an indictment of advertising. It ends with the line, “What the large print giveth, the small print taketh away.” See Murray Ohio Mfg. Co. v. Continental Ins. Co., 705 F.Supp. 442, 444 (N.D.Ill.1989) (quoting "Tom Waits’ noted maxim” in interpreting insurance contract).

. The proposed instruction read in pertinent part:
*1101 Style is the way, manner or method of carrying out an activity____ In contemporary music, there are a great many styles or "sounds,” for example ... blues, dixieland, country and western, rock, rap, rhythm and blues, etc. Style is how a song is sung, how the music is delivered, how the words of a song are expressed. Style includes mood, phrasing, and timing, whether a selection is performed loudly or quietly, whether the song is expressed in singing, talking, or a combination of the two. Style is not subject to ownership. No singer can appropriate for himself any style and exclude others from performing in the same style. Any singer is free to sing in the same style as any other singer. That is why we have a great many opera singers, blues singers, country-western singers, etc.
Defendants could not be held liable to plaintiff merely because the singer in their commercial performed in the same style as plaintiff has performed in.

. This instruction effectively added an additional element to Midler's formulation of voice misappropriation: actual confusion. The validity of this instruction is not before us in this appeal and we express no opinion on this issue.

. Beyond arguing that the issue should not have been submitted to the jury in the first instance, the defendants do not challenge the sufficiency of the court’s jury instructions on punitive damages. Because we affirm the jury’s conclusion that the defendants acted in conscious disregard of Waits’ rights, we reject defendants’ claim that the award of punitive damages violated their due process rights because they lacked notice that their conduct would violate Waits' rights.

. Although we agree with the defendants that the damage award is duplicative and vacate it, the underlying issues of the cognizability of false endorsement actions, Waits’ standing to sue, and the merits of his Lanham Act claim are not moot, inasmuch as the judgment on this claim also supports an award of attorneys' fees.

. In Cher v. Forum Int'l Ltd., 692 F.2d 634, 637 n. 1 (9th Cir.1982), cert. denied, 462 U.S. 1120, 103 S.Ct. 3089, 77 L.Ed.2d 1350 (1983), we expressly declined to decide whether the Lanham Act provides relief for such a claim, and based our decision instead on state unfair competition law.

. Section 43(a), as amended in 1988, now reads in pertinent part:
Any person who, on or in connection with any goods or services ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation or origin, false or misleading description of fact, or false or misleading representation of fact, which—
(1) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, i
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a) (1988) (emphasis added).

. Although Halicki in passing characterizes the plaintiffs claim as one for "false designation" it does not use this term as a term of art to indicate the misuse of a trademark which falsely designates the film’s origin or the association of the trademark’s owner with the film. Instead, the term is used in its generic sense to refer to the use of a rating designation which falsely represents the film’s content.

. We do not mean to imply that competition between the parties is irrelevant, for it is one factor examined by courts in analyzing the merits of a false association claim. A false association claim requires that the misuse of a trademark or other distinguishing device confuse consumers as to the origin, approval, or endorsement of the product. See International Order of Job’s Daughters v. Lindeburg & Co., 633 *1110 F.2d 912, 919-20 (9th Cir.1980) (limiting infringement claims under section 43(a) to those where use of trademark leads to confusion over endorsement or sponsorship), cert. denied, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956 (1981). Consumer confusion may be demonstrated by the use of similar or identical trademarks on competing goods, but may also be established in other ways. See Lindy Pen Co. v. Bic Pen Corp., 796 F.2d 254, 255 (9th Cir.1986) (competition between parties not automatically required to prevail on trademark infringement claim, but is one factor in determining likelihood of consumer confusion). Our conclusion that competition is unnecessary relates only to the determination of standing under section 43(a); analysis of the merits of such a claim is a separate inquiry. See infra, section II.C.

. In reaching this conclusion, we are mindful that Midler, on facts similar to those involved here, disapproved the plaintiff’s unfair competition claim because she "did not do television commercials. The defendants were not in competition with her.” Midler, 849 F.2d 460, 462-63. Midler, however, did not involve a Lanham Act claim, but rather a common law unfair competition claim. Nor were we called upon there to examine standing in the specific context of a false endorsement claim, for Midler had not grounded her unfair competition claim on such a theory. Notably, Midler had sought in the district court to amend her complaint to include a claim under section 43(a) of the Lanham Act on a theory of false endorsement. The district court denied her request, not because she lacked standing as the defendants there had argued, but because her delay in seeking to amend was prejudicial. See Midler v. Ford Motor Co., No. 86-2683 (C.D.Cal.), Record at 7, 43, 48. Our statement in Midler, therefore, is dicta as it relates to Lanham Act standing and is not controlling here.